AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
5/6/2021
CENTRAL DISTRICT OF CALIFORNIA
BY:  JB  DEPUTY

| | |
|---|---|
| United States of America<br><br>v.<br><br>SERGIO VERDUGO and<br>ROBERTO PINA,<br><br>Defendant(s) | Case No.   2:21-mj-02250-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 4, 2021 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Michael Studley*
Complainant's signature

Michael Studley, DEA Special Agent
Printed name and title

Attested to by the applicant in *in person.* accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   May 6, 2021

_____
Judge's signature

City and state:  Los Angeles, California      Hon. Patricia Donahue, U.S. Magistrate Judge
Printed name and title

AUSA: Alexander Robbins – 213-894-3493

**AFFIDAVIT**

I, Michael W. Studley, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Sergio Verdugo ("VERDUGO") and Roberto Pina ("PINA") and for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), as described more fully in Attachment A:

    a. One black Apple iPhone seized from VERDUGO's pocket when he was arrested ("SUBJECT DEVICE 1");

    b. One black LG cellphone with serial number GPLGL322DCGB seized from VERDUGO's pocket when he was arrested ("SUBJECT DEVICE 2"); and

    c. One rose gold Samsung cell phone with IMEI: 355298661976648 seized from the car PINA was driving when he was arrested ("SUBJECT DEVICE 3").

3. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am an investigator and law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered by law to conduct investigations of, and make arrests for, the federal felony offenses enumerated in 18 U.S.C. § 2516.

6. I have been employed as a Special Agent ("SA") of the Drug Enforcement Administration ("DEA") since October 2019, and currently am assigned to the DEA Los Angeles Field Division Group 1. I received and completed formal training that included a 16-week DEA training program in Quantico, Virginia. I have specialized training and experience in the investigation of major narcotics trafficking organizations involved in violent crimes, racketeering, conspiracy crimes, and narcotics importation and distribution. I have participated in the debriefing of defendants and informants who had personal knowledge regarding major narcotics trafficking organization,

including cartels in Mexico. I am familiar with narcotics traffickers' methods of operation, including the manufacture, storage, transportation, and distribution of narcotics, the collections of money that represents the proceeds of narcotics trafficking, and money laundering. Prior to being employed with the DEA, I was employed with the United States Border Patrol and assigned to the Douglas Station in Southeast Arizona from September 2016 to October 2019. I also received and completed formal training that included and 18-week training program in Artesia, New Mexico prior to being assigned to Douglas Station. Throughout my career with the Border patrol I participated in drug and human trafficking investigations.

7. I am also familiar with the sophisticated methods that drug organizations use to avoid detection by law enforcement, such as using multiple cellphones, pre-paid cellphones, and counter-surveillance measures, vehicles with concealed compartments, false or fictitious identities, and coded and/or vague communications over cellphone and two-way radios. I am aware that drug traffickers drop or switch telephones and/or telephone number frequently to thwart law enforcement investigation of their criminal activates.

### III. SUMMARY OF PROBABLE CAUSE

8. After being connected through a confidential source (the "CS"), an undercover DEA agent (the "UC") conversed with VERDUGO about purchasing fentanyl pills in Los Angeles, California. On or about April 22, 2021, VERDUGO and the UC discussed the purchase of 2,000 fentanyl pills for $5,000. On

or about April 22, 2021, PINA drove a black 2008 Chevrolet Tahoe, bearing California license plate 7JCD497, carrying passenger VERDUGO, who delivered to the UC two clear plastic baggies containing approximately 230 gross grams of light-blue-colored pills.

9. On or about May 3 and May 4, 2021, the UC communicated with a broker and with VERDUGO to set up a buy for additional pills.

10. On or about May 4, 2021, PINA drove VERDUGO to a pre-arranged meeting location to sell the UC additional pills. PINA and VERDUGO arrived together in the same Chevrolet Tahoe. VERDUGO was arrested after leaving the Chevrolet Tahoe to meet UC. He was carrying a large bag containing approximately 53,000 suspected fentanyl pills, and attempted to flee before he was arrested. PINA fled in the Chevrolet Tahoe and was subsequently arrested. He had approximately 1,000 suspected fentanyl pills with him in Tahoe.

11. Agents seized SUBJECT DEVICE 1 and SUBJECT DEVICE 2 from VERDUGO's person upon arrest, and seized SUBJECT DEVICE 3 from inside the Tahoe upon PINA's arrest.

## IV. STATEMENT OF PROBABLE CAUSE

12. Based on my review of law enforcement reports, conversations with other law enforcement agents who were involved in this investigation, my own knowledge of the

investigation, and my conversations with the CS,[1] I am aware of the following:

### A. In April 2021, a Source of Supply Coordinates with the CS the Sale of 2,000 Fentanyl Pills in Los Angeles

13. In April 2021, the CS advised the DEA about a source of drug supply who could provide large quantities of fentanyl pills in the Los Angeles, California area. At the direction of the DEA, the CS began communicating with that source to discuss the potential purchase of fentanyl pills.

14. On or about April 19, 2021, the source of supply provided the CS with a Mexican-based telephone number ending in 6059. The source told the CS that the number belonged to the source's associate, who brokers and arranges the logistics for drug deals in Los Angeles.

15. On or about April 19, 2021, the broker, using the Mexican-based telephone number ending in 6059, contacted the CS to discuss a deal for fentanyl pills. The broker agreed to sell the CS a sample of 2,000 fentanyl pills, to be followed by a larger deal if the sample deal went well. The broker further advised that his courier operating in Los Angeles would contact the CS's associate for further details regarding the meeting location for the deal.

---

[1] The CS has cooperated with the DEA since 2012. Since that time, the CS has provided information for over 50 investigations, both foreign and domestic, including many involving drug seizures. The information provided by the CS has been corroborated and has been proven to be reliable. The CS has been convicted of a drug trafficking offense in the United States. The CS has received immigration benefits from the DEA and is also working for financial compensation.

16. On or about April 21, 2021, the broker contacted the UC, who was posing as the CS's associate, and explained that a courier operating in Los Angeles would contact the UC for further details regarding the meeting location.

### B. On April 22, 2021, VERDUGO and PINA Sell 2,000 Suspected Fentanyl Pills to UC

17. On April 22, 2021, at approximately 8:40 a.m., the UC received a text from the broker with the Mexican-based telephone number stating that the courier would reach out soon. Moments later, a male caller, using a telephone number ending in 9370, contacted the UC. In a series of calls and texts, the two agreed to meet at a location on Border Avenue in Torrance, California, and the UC described to the caller the type of car the UC would be driving.

18. At approximately 1:44 p.m., the UC received a call from the phone number ending in 9370. During this conversation, the UC provided an alternate meeting location, at a nearby Lowe's home improvement store, located at 22255 S. Western Ave, in Torrance, California.

19. At approximately 2:05 p.m., Detective Crisfield of the Torrance Police Department ("TPD") observed a black Chevrolet Tahoe, bearing California license plate 7JCD497 (the "Tahoe"), driving through the parking lot and park two spaces away from the car driven by the UC. Moments later, Detective Crisfield observed a Hispanic male (later identified as VERDUGO) exit the passenger seat of Tahoe. At that time, the UC directed the Hispanic male to enter the front passenger seat of the UC's

6

vehicle to conduct the deal. The Hispanic male introduced himself as "Sergio." While in the UC's vehicle, VERDUGO showed and gave the UC two clear plastic bags with numerous light-blue colored pills stamped with "M" and "30". The UC then gave VERDUGO the money for the pills.

20. VERDUGO then exited the UC's vehicle with the money and got in the Tahoe on the passenger side, after which the Tahoe drove off. TPD Detective Masone observed that the Tahoe was driven by another Hispanic male (later identified as PINA).

21. Later that day, the DEA processed the suspected fentanyl pills as evidence, which had an approximate weight of 230 gross grams. The pills were field tested and returned positive results for acetaminophen and xylazine, which I know, based on my training and experience, are commonly mixed with fentanyl. The pills were subsequently sent to the DEA's laboratory and are pending further testing.

22. Law enforcement officers followed VERDUGO and PINA home from the deal and determined that VERDUGO had returned to an apartment on Cabrillo Avenue and that PINA had returned to an apartment on West Carson Street, both in Torrance, California. Law enforcement officers later conducted surveillance of both locations and determined that VERDUGO resided at the Cabrillo Avenue location, and PINA resided at the West Carson Street location.

**C.  On May 4, 2021 VERDUGO and PINA deliver approximately 53,000 suspected fentanyl pills to the UC and were apprehended.**

23.  On May 3, 2021, the broker called the UC multiple times from the same Mexican-based telephone number ending 6059. The broker told the UC that they were ready for a larger deal the next day, and then kept calling back to change the time the deal would take place.

24.  On May 4, 2021, at approximately 8:15 a.m., TPD detective Crisfield observed PINA exit the Tahoe and enter the West Carson Street apartment.

25.  At approximately 8:52 a.m., the broker called the UC to confirm the deal for that day.

26.  At approximately 9:00 a.m., TPD Sgt. Vazquez observed VERDUGO enter a hallway at the Cabrillo Avenue apartment.

27.  At approximately 9:12 a.m., TPD detective Crisfield observed PINA exit the front door of the West Carson Street apartment, and walk to the rear passenger side of the Tahoe. PINA retrieved a grey and black duffle bag (that appeared to have items inside of it based on its weight) from inside the Tahoe, and walked the duffle bag back upstairs to the front door of the West Carson Street apartment.

28.  At approximately 10:13 a.m., DEA SA Andrew Davis observed PINA exit the front door of the West Carson Street apartment, carrying what appeared to be the same grey and black duffle bag (which still appeared to have items inside of it and did not appear to be empty). PINA took the duffle bag and placed it in the rear passenger compartment of the Tahoe. PINA

8

entered the Tahoe as the driver and left the driver's door open. PINA remained in the driver seat of the Tahoe for several minutes with the driver's door open.

29. At approximately 1:55 p.m., VERDUGO called the UC from a new telephone number, this one ending in 7270. At approximately 2:03 p.m., the UC called VERDUGO back at the same number. VERDUGO answered but then got another call and hung up. VERDUGO called back at approximately 2:09 p.m. During the calls, VERDUGO stated, in sum in substance, that he was ready, and was trying to figure out how many pills to bring. VERDUGO said he was only 10 minutes away from the Lowe's meeting location.

30. At approximately 2:07 p.m., TPD Detective Tanaka observed the Tahoe park in front of the Cabrillo Avenue apartment. PINA exited the driver's seat of the Tahoe and stood outside the driver's door talking on the phone. Detective Tanaka then observed PINA reenter the Tahoe as the driver. TPD Detective Kuet observed VERDUGO exit the Cabrillo Avenue apartment carrying a water bottle and enter the Tahoe on the front passenger side.

31. At approximately 2:09 pm, TPD Detective Tanaka observed the Tahoe leave the Cabrillo Avenue apartment and travel to the meeting location at the Lowe's parking lot at 22255 South Western Avenue.

32. At approximately 2:12 p.m., SA Andrew Davis observed VERDUGO exit the front passenger seat of the Tahoe carrying what

appeared to be the same grey and black duffle bag PINA had been seen carrying earlier that day.

33. SA Davis then observed VERDUGO walk to and enter the UC's vehicle on the front passenger side with the duffle bag. The UC greeted VERDUGO and asked if VERDUGO had "them" (meaning the fentanyl pills), to which VERDUGO responded yes. The UC then asked to see the pills and VERDUGO opened the duffle bag. The UC saw the pills, exited the car, and gave a signal to other law-enforcement agents.

34. VERDUGO then got out of the UC's vehicle. After seeing DEA agents with police insignia came out of their vehicles, VERDUGO ran away from the agents on foot. DEA agents caught VERDUGO and he was apprehended. DEA agents seized SUBJECT DEVICE 1 and SUBJECT DEVICE 2 from VERDUGO's pants pockets. Agents also seized the grey and black duffle bag that VERDUGO had left in the UC's car, which contained approximately 6.74 gross kilograms of suspected fentanyl pills. These pills have been sent to the DEA's laboratory for testing.

35. At approximately 2:15 p.m., at the same time VERDUGO was apprehended, I observed the Tahoe drive out of the parking lot at a high rate of speed. SA Barrett Warren, TPD Detective Kevin Tanaka, and I followed the Tahoe by car. DEA agents and TPD officers attempted to perform a traffic stop on the Tahoe at Cabrillo Ave and 218th street. The Tahoe continued for more than a block after the officers activated their lights until it was forced to stop due to oncoming traffic. PINA exited the Tahoe and was arrested. Inside the Tahoe, I noticed that there

was one clear, knotted baggie containing multiple light-blue colored pills marked with "M" and "30", and another tightly wrapped packaged in clear plastic wrap marked "TOYOTA," both on the rear floorboard of the Tahoe. TPD Detectives had the Tahoe towed to the Torrance Police Department. SUBJECT DEVICE 3 was found on the front driver seat of the Tahoe.

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

36. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

    b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences and vehicles.

    c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-

mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence and vehicles. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e. Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis. Such currency is often stored in their residences and vehicles.

g. Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes. They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h. It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

37. As used herein, the term "digital device" includes the SUBJECT DEVICES.

38. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally,

when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

        b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    39.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

      a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    40.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices to be searched.

c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress VERDUGO's or PINA's thumb and/or fingers on the device; and (2) hold the device in front of

VERDUGO's or PINA's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

41. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

42. For all of the reasons described above, there is probable cause to believe that Sergio VERDUGO and Roberto PINA have committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 6 day of May, 2021.

THE HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE